# CHARLESTON.

STEWART *et al. v.* STEWART.

Submitted June 12, 1894.—Decided December 8, 1894.

1. EQUITY PRACTICE—LOST PAPERS—WAIVER.

Where the original papers in a cause have been lost, they may be supplied as provided in section 14 of chapter 130 of the Code; and in a chancery cause, where the lost bill is thus supplied, and the defendant appears and files his answer thereto, he thereby waives any objection to the manner in which the bill was supplied, or to the authenticity of the copy thus supplied.

2. EQUITY PRACTICE—CONSENT DECREE—CLERICAL ERROR.

After the term at which a consent decree is entered it can not be set aside, modified, or altered without the consent of the parties, except only to correct a clerical error, which is a mistake made by the clerk in entering such consent decree, and it may be corrected by the original draft of the decree furnished the clerk by the court; or it may be a miscalculation or mistake in some arithmetical operation, whereby an erroneous sum is entered in such consent decree, where all the parties are agreed on the basis of the calculation, and the mistake is simply an arithmetical mistake, or a simple blunder, in performing an arithmetical operation, all parties being agreed on the operation to be performed.

3. EQUITY PRACTICE—CLERICAL ERROR.

In order that a decree may be corrected or reversed on motion under section 1 of chapter 134 of the Code, the error complained of must be a clerical error, or error in fact for which a judgment or decree may be reversed or corrected on motion or writ of error *coram nobis.*

4. EQUITY PRACTICE—COMMISSIONER'S REPORT.

When questions purely of fact are referred to a commissioner, to be reported upon, the findings of the commissioner, while not as conclusive as the verdict of a jury, will be given great weight, and should be sustained unless it plainly appears that they are not warranted by the evidence. This rule operates with peculiar force in an appellate court where the findings of the commissioner have been approved and sustained by the decree of the inferior court.

5. EQUITY PRACTICE—EXCEPTIONS—COMMISSIONER'S REPORT.

Generally, exceptions to the report of master commissioners.

partake of the nature of special demurrers, and, if the report is erroneous, the party complaining of the report or excepting thereto must point out the errors in his exceptions with reasonable certainty, so as to direct the mind of the court to them. When he does so, the parts not excepted to are admitted to be correct, not only as regards the principles, but also as relates to the evidence, on which they are founded.

7. EQUITY PRACTICE—CONSENT DECREE—CLERICAL ERROR.
   A decree or order made by consent can not be set aside either by rehearing or appeal or by bill of review, unless by clerical error anything has been inserted in the order as by consent, to which the party had not consented, in which case a bill of review might lie.

U. N. ARNETT, JR., and J. A. HAGGERTY for appellant, cited Bently on Personal Property, § 85; 9 Cowan 687; 18 Am. Dec. 543; 1 Humph. 498, 505; McMull. 459; 18 W. Va. 244.

COX & BAKER for appellees, cited 7 W. Va. 152, 380; Code, c. 130, s. 14; Code, c. 78, s. 9; 28 W. Va. 370; 17 W. Va. 649; 11 W. Va. 482 and 400; 2 Bart. Ch. Pr. 796, 797; 1 Id. 126-7, 339; 11 W. Va. 482; 29 W. Va. 201, 400; Code, c. 134, s. 5; 23 W. Va. 482, 485; 3 W. Va. 659; 8 W. Va. 174 *et seq.;* 1 Bart. Ch. Pr. 332, 334, 336; 12 W. Va. 371; 25 W. Va. 544, 549; Code, c. 133, s. 12; 2 Bouv. L. D. 569; 2 Waits Act. & Def. 247 *et seq.;* Code, p. 668, s. 6.

OKEY JOHNSON for appellee, cited 31 W. Va. 137; 11 W. Va. 482; 17 W. Va. 649; 14 W. Va. 531; 18 W. Va. 184; 26 W. Va. 710; 18 W. Va. 507; 30 W. Va. 147; 33 W. Va. 157.

ENGLISH, JUDGE:

Robert Stewart was at one time the owner of a tract of land situated in Monongalia county, on which he resided, and raised a family of eleven, consisting of sons and daughters. He died intestate, leaving his children, four boys and seven girls, surviving him, whose names were as follows: William, Charles, John, Foster, Anna, Isabel, Elizabeth, Mary, Susannah, Jane and Rebecca. Four of them, to wit, William, Charles, Anna and Isabel, married, while the other seven remained single. Isabel had no children, but to the other three who married were born eighteen children, and this suit was brought by seventeen of the grand-children

of said Robert Stewart against John Stewart, Jr., who was a son of said Charles Stewart, to obtain a partition of the real estate inherited from their uncles and aunts, and also to obtain a share of the personal estate left by said uncles and aunts; the said John Stewart, Jr., claiming to be the sole owner of the personal estate left by said relatives.

All of the children of said Robert Stewart were dead at the time of the institution of this suit: John Stewart, Sr., and Rebecca Stewart alone of said eleven children having disposed of their property by will, and under the will of said Rebecca said John Stewart claims the personal property entirely, and a large portion of the real estate.

When Anna, Charles and William married, they sold their interest in the home farm to Foster, Mary, Susannah, Elizabeth and Jane; Isabel becoming no party to the purchase, but retaining her interest.

In the winter of 1866-67, said Foster, Susannah, Elizabeth, Jane and Rebecca bought a farm known as the "Smith Farm," containing seventy five acres, adjoining the home farm. The unmarried brothers and sisters made their home on these lands, and cultivated the same, and, being industrious and frugal, their earnings went into a common fund, they living together as one family.

The bill in this cause was filed in the Circuit Court of Monongalia county on the first Monday in January, 1889, by William H. Stewart and others. The process appears to have been returned executed, the rules seem to have been regularly taken, the bill regularly taken for confessed, and the cause set for hearing. On the 22d day of February, 1889, the defendant, John Stewart, filed his answer to the plaintiffs' bill, and the plaintiffs replied generally thereto. On the 24th day of June, 1889, the case was heard upon the bill and upon the answer of said John Stewart in his own right, also as devisee of Rebecca Stewart, deceased, general replication thereto, exhibits and depositions, on consideration whereof the court was of opinion that John Stewart, deceased, by his last will and testament, dated February 10, 1864, devised his real and personal estate to his four sisters Elizabeth Stewart, Mary Stewart, Susannah Stewart and Rebecca

Stewart and his brother Foster Stewart for life, until the death of the last mentioned of them, and then to be divided among their legal heirs, and that their sister Jane took nothing by said will; and the court, being of opinion that the cause should be referred to a commissioner, proceeded to refer it to John J. Brown, commissioner, to report certain requirements therein set forth.

On the 12th day of November, 1889, another decree appears to have been entered in said cause, when it was heard upon the report of said commissioner, John J. Brown, and exceptions thereto both by plaintiffs and defendants, and on consideration thereof the court appointed commissioners, and directed them to go upon the lands in the bill mentioned, and partition them between the said John Stewart and the plaintiffs in the manner and the proportions therein prescribed.

On the 27th day of February, 1890, the report of John E. Price, surveyor, and Joseph Reiner, two of the commissioners appointed by said decree of November 12, 1889, was recommitted, and William H. Brand, surveyor, was substituted in the place of John E. Price, surveyor.

On the 25th day of June, 1890, another decree was entered in said cause, in which it is stated that on that day John A. Dille, a member of the firm of Dille & Son, who brought this suit for the plaintiffs, which had been pending over a year, filed his affidavit, from which it appeared that a large amount of testimony had been taken; that there had been a decree of reference, and a report thereon, showing the amount of lands coming to the plaintiffs, and the amount to the defendants, the amount of personalty coming to each, and settling generally the rights of the parties to the suit; that there had also been a decree appointing commissioners to make partition of said lands, and a report made, which was recommitted, that the said Dille & Son had all of said papers in their office for examination, *etc.*, and that the whole of said original papers, including bill, answer, exhibits, depositions and reports, were, on the morning of the 17th of March, 1890, destroyed by fire by the burning of the law office of the said Dille & Son, and that the bill then filed, marked "Filed May 7, 1890," was substantially a copy of

said bill, and that exhibits from one to six were true copies of exhibits filed with said original bill, and exhibits marked seven, eight, nine and ten were filed with said last named bill; and the court, having seen and inspected said affidavit, bill and exhibits, ordered that the said cause be docketed again in said court, and proceeded in, heard and determined on said copy of said bill, exhibits, depositions and proceedings thereinafter had according to section 14 of chapter 130 of the Code, and the defendant, should he choose to do so, should have leave to file his answer to said bill or demur thereto; and the cause was remanded to rules for further proceedings therein. The defendant, John Stewart, appeared at rules, and answered said bill, first saving all just exceptions thereto, and demurring to the same as insufficient in law.

The plaintiffs, in their bill, after showing their relation to their grandfather, Robert Stewart, proceeded to state: That said Robert died seised and possessed of the seventy five acre-tract of land aforesaid, but of little or no personalty, leaving the eleven children whose names have been already given, who with their mother, continued for many years to reside on said farm; and that whatever was saved or accumulated was kept by them as a joint property until about the 10th day of April, 1855, when Charles, William and Anna were married, when said William and wife, Charles and wife and Anna and her husband, Lot Henthorne, sold and conveyed their undivided three elevenths of said farm to their five sisters and brothers, to wit, Mary, Susannah, Elizabeth, Jane, Rebecca and Foster, and that left the family to consist of the widow and eight children, each having one-eleventh in said farm, and Mary, Susannah, Elizabeth, Foster, Jane and Rebecca having in addition thereto, the undivided three-elevenths of Charles, William and Anna. That they all lived together, worked the farm jointly, and the accumulations were held together, each contributing their just proportion of the labor necessary to run said farm successfully and profitably, until the 11th of February, 1864, when John departed this life testate, devising his estate, both real and personal, to his brother Foster, and his sisters Mary, Susan-

nah, Elizabeth and Rebecca, and the survivors of them, for life, and then to descend to his legal heirs. After the death of John, and from that time until the death of Mary, on the 2d day of April, 1865, the family consisted of Mary, Susannah, Elizabeth, Isabel, Foster, Jane and Rebecca, who all lived together, and had whatever of personal estate had been accumulated during the lifetime of John in common, and whatever interest John had therein passed under his will to those surviving him, without any distribution among those entitled thereto, and Mary's interest in said personal estate, as well as her interest in the home-farm, whether by descent or purchase, descended to her legal heirs without any partition or distribution, and thus the said estate remained in the hands of said survivors, to wit, Susannah, Elizabeth, Foster, Jane and Rebecca; Isabel having in the meantime married Pierpoint, and moved away from said home tract, and remained away until the death of her husband, and when she returned she only made her home with her brother and sisters, having and enjoying a pension from the government; and the savings and accumulations up to the 27th day of March, 1867, were invested by them in the Smith farm, of about seventy three acres, adjoining the home-farm; and the plaintiffs allege that the money invested in said Smith farm was the joint accumulations of said John in his lifetime, Mary during her lifetime, Susannah, Elizabeth, Foster, Jane and Rebecca; and said Smith farm, at the death of said respective grantees (Rebecca excepted) descended to their legal heirs. After the death of the said Mary, the said home-farm, as well as the Smith farm, was held, used and enjoyed by the said Susannah, Elizabeth, Foster, Jane and Rebecca, and whatever they accumulated on said farms was held by them up to the death of Susannah which occurred on the 19th day of May, 1870, and they allege that the general impression was that the personal estate at that time could not amount to less than one or two thousand dollars, and the whole passed into the possession of Elizabeth, Foster, Jane and Rebecca, and there remained, with the accumulations thereon, until the death of Foster, on the 5th of April, 1872. Then the two farms went into the possession of Elizabeth, Jane and

Rebecca, with the personal estate, and they had the entire rents and profits thereof until the death of Elizabeth, which occurred on the 20th day of July, 1883. Said real and personal estate then went to Jane and Rebecca, who possessed and enjoyed the whole thereof up to the time of the burning of their house, the latter part of the year 1887; and that very little of the money on hand was destroyed by said fire, and all of the personal estate, moneys, notes, *etc.*, not destroyed by the fire was held by said two sisters, and was the joint property of plaintiffs, as the heirs of their said uncles and aunts, and the said Jane and Rebecca. And they allege that they are informed and believe there must have been from one to two thousand dollars in money saved from said fire, in addition to the notes and accounts held by them, personal property, stock on said farm, *etc.;* that said Jane and Rebecca held the same for the benefit of themselves and the plaintiffs, including whatever real and personal estate was left them by their aunt Isabel, who died on the 13th day of November, 1885, and that the money left by said deceased aunt could not be less than one thousand dollars; that the whole of the personal property specified in the appraisement bill of John Stewart, executor of Rebecca Stewart, deceased, was the same personal property that was in the joint possession of said Elizabeth, Jane and Rebecca previous to the death of said Elizabeth, on the 20th day of July, 1883, and the death of said Jane, on the 15th day of January, 1888, and that the said John, who lived on the said Smith farm, and was the tenant of his said aunts, was fully advised in reference thereto; and they allege that the said John Stewart, Sr., Mary, Susannah, Elizabeth, Foster, Jane and Rebecca all worked together, and held their accumulations in common, and, although the business may have been done at one time by one and at another time by another, no one had any more in it than another; and that Rebecca Stewart, the last survivor of Robert Stewart's family, would have died, as did the rest, without making any disposition of her interest in said estate, had it not been for her age and the influence of some one upon her in her weakness and old age, as she was about eighty years of age when she died, on the 2d day of July, 1888. But

plaintiffs say that if John, the devisee of said Rebecca, will let them have their interest in said property, they will say nothing about said will, and let said John have the undivided interest of Rebecca in said real and personal estate; but they claim the residue as aforesaid. They exhibit a copy of the will of Rebecca Stewart, deceased, and also a copy of the appraisement bill of her personal estate, and they ask the defendant to answer; and say what items, if any, in said appraisement bill, were the separate property of said Rebecca; that he also state what money was saved from the fire, who took the same from the house, and whether, after the death of said Rebecca, all of said money and personal property did not come into his possession, and whether or not, to his knowledge, the said Rebecca ever inherited any property, real or personal, other than what she inherited from her father, brother and sisters. And they claim their undivided interest in said farms and personal estate, and, as their interests in said land are small to each one, being eighteen in number, that their interest in the whole land be laid off together, in order that the same may be sold together, and the proceeds be divided between them, as it is not susceptible of partition in kind between them; and that John's, the defendant's share, if he so desires it, be laid off together, either from both tracts or wholly from one of them, as shall seem best, by commissioners appointed for that purpose; that the case may be referred to one of the commissioners of the court, to ascertain what amount each of said heirs (the plaintiffs, as heirs of William, Charles and Anna) have in each of said farms, and what amount the defendant has, as one of the heirs of Charles and as devisee of Rebecca, who has been in possession of said real estate since the death of Rebecca, the rents and profits, and who is entitled to same, what personal estate came into the hands of said John Stewart at the death of Rebecca belonging to said John, as devisee, and these plaintiffs, and the amount coming to each.

In his answer to the plaintiffs' bill, the defendant, John Stewart, admits the allegations of the bill as to his being the son of Charles Stewart and the grandson of Robert Stewart, as well as the other allegations of the bill which

state the names and number of the children of said Robert, and also as to the property left by the said Robert at the time he died intestate; that all of the children of said Robert are now dead, Rebecca being the last survivor, and that the orders, as well as the time of the deaths of all of said children are about accurately stated; and claims that no one could administer upon the estate of any of them until after Rebecca's death, when he qualified as executor of her estate, as requested by her will. He also admits the facts stated in the bill as to the sale by William and wife, Charles and wife, and Anna Henthorne and husband to Mary, Susannah, Elizabeth, Jane and Foster, and also as to the purchase of the Smith tract by said Foster Stewart and his sisters, Elizabeth, Susannah, Rebecca and Jane, in which he says neither the said William nor Charles nor Anna had any interest whatever unless it be held that they inherited an interest therein at the death of said purchasers, respectively, which he does not admit. Respondent admits that the sisters and their brother made their homes together on said farm, but he denies that they all worked the farm. He says the females all aided in the housework, but that Rebecca was the best qualified to acquire or manage or dispose of property, and she was in fact the manager and controller of both of said farms, as well as of all the stock and other property on them, and rented said lands to respondent in her own name, and the other sisters seemed to be living there by the sufferance and pleasure of Rebecca; that he paid the rents to Rebecca or her order, and the rents were taken to the dwelling house on the home farm, and used there in the support of the family and in feeding the stock. The residue of the answer is somewhat argumentative, but puts in issue the material allegations of the bill, and in answer to the specific interrogatories propounded to him by the bill he says that, as he understands it, and understood it at the death of the said Rebecca, each and all of the items described in said appraisement bill were, at the time of her death, the sole and separate property of the said Rebecca, and were so, as he believes and understood it, for years before she died, but he can not say from whom she acquired or derived

them, or how she obtained them; that he does not know and can not say how much money was in fact saved from the fire except the seventeen and one fourth pounds of foreign. and mutilated coin and a five or ten dollar gold piece picked. up by some one afterwards near the burned house; nor can he remember who in fact took the money so found from the said house, and all of the money so found after the death of Rebecca and after respondent's qualification came into his possession as such executor, to hold until the right thereto should be settled, and is still so held by him, except that he was advised to have said foreign coin valued by a competent. person, and disposed of, and put into current funds, which he did, and the same was so found to be of forty three dollars and thirty five cents less value than as so appraised; and that he has no knowledge of said Rebecca inheriting any property, real or personal, other than what she so inherited from her father, brother and sisters; and he denies each and every allegation of said bill in conflict with this answer.

On the 12th day of February, 1892, the cause was heard upon the bill and exhibits supplied according to law, together with the affidavit of the loss of the original papers by fire in the law office of Dille & Son, and the answer of John Stewart in his own right and general replication thereto, and upon the statement of John J. Brown, commissioner in chancery, to whom the case had been referred at a former term of the court, setting out according to the best recollection of said commissioner, the substance of his report in this case under the order of reference made therein, and exceptions to the supplied report of said commissioner by the plaintiffs indorsed thereon in writing, and upon the depositions for the plaintiff taken in the cause, and upon the orders and decrees made in the cause and depositions; upon consideration whereof the court was of opinion that the exceptions to the statement or supplied report of John J. Brown, commissioner, as aforesaid, were well taken, and it was decreed that the cause be recommitted to I. G. Lazzell, a commissioner in chancery, to ascertain and report certain facts therein specified. On the 21st day of June, 1892, a decree

was entered in said cause, when it appears to have been heard on the papers theretofore filed in the cause, and orders and decrees thereinbefore made, depositions and exhibits, and upon the report of John E. Price, surveyor, Joseph Reiner and William B. Long, commissioners, appointed at the February term, last, to go upon the lands in the bill and proceedings mentioned and described, and make partition thereof, according to quantity and value, among the plaintiffs in the suit sixty *per centum* of said lands, and to the defendant John Stewart, forty *per centum* of said lands; and it appearing to the court that the report of the said commissioners, and the plat filed therewith, are regular on their face, and, there being no exception to the same, they were approved and confirmed, and it was decreed that the plaintiffs should take and hold in fee simple lot number two as laid down in the plat and report of said commissioners, being sixty *per centum* of said land according to quantity and value, bounded and described as set out by metes and bounds in said decree, containing eighty five and a half acres, more or less; and that the defendant, John Stewart, do hold in fee simple lot number one as shown on said report and plat, being forty *per centum* of said lands, bounded and described as set forth in said decree by metes and bounds, containing seventy two and one half acres, more or less; and that a writ of possession do issue out of the office of the clerk of said court, and that the plaintiffs be placed in possession of the lands so assigned to them in this partition upon the application of any of said plaintiffs, and that the plaintiffs do pay sixty *per centum* of the costs of said partition and the defendant forty *per centum* thereof; and it appearing to the court that I. G. Lazzell, to whom this cause was referred at a former term, had not made up his report, all matters so referred to said commissioner were reserved for future consideration of the court.

On the 19th day of October, 1892, the final decree in the cause was entered, when the same was heard upon the papers and decrees before read therein, and upon the report of I. G. Lazzell, a commissioner in chancery, to whom the cause was referred, as before stated, and the depositions taken before

said commissioner and other proper officers, and upon the exceptions to said report by counsel for defendant, overruling said exceptions in part and sustaining them in part, as appears from the face of said decree; and the said commissioner having found a net balance of personalty in the hands of John Stewart for distribution amounting to one thousand three hundred and sixty five dollars and forty seven cents, of which amount eight hundred and nineteen dollars and twenty four cents was to be paid to the seventeen plaintiffs and five hundred and forty six dollars and twenty three cents to be retained by the defendant, John Stewart, and ordered that the said sum of eight hundred and nineteen dollars and twenty four cents be a lien upon the real estate of said John Stewart, and directed that said John Stewart pay the costs of said suit, except the costs of partition, which had been provided for in a former decree.

It appears from the record that the decree appointing commissioners to go upon the lands in controversy and partition them in the proportion of sixty *per centum* to the plaintiffs and forty *per centum* to the defendant was a consent decree, appointing commissioners therein named to go upon said lands, and partition them in that proportion, which report was made by said commissioners, and confirmed without exception. The defendant, John Stewart, on the 18th day of February, 1893, had a notice served upon the plaintiffs of a motion to reverse the final decree rendered in said cause under the provisions of chapter one hundred and thirty four of the Code, which motion was supported by his own affidavit, in which he denies that any person was authorized to consent to said decree ascertaining the proportions in which the parties were entitled to the land in controversy. He is, however, contradicted by the affidavit of his attorney, who states that Keckson & Fast were the attorneys of record for the said Stewart, defendant in said suit, and they had full and complete authority to bind the defendant, and that they did consent as shown by said decree.

The errors, however, which are sought to be corrected under this notice are not such errors as may be so corrected under the statute.

Upon this question, Minor, in his Institutes (volume 4, pt. 1, at page 854) says: "It is clear that the provision was intended to apply exclusively to those inadvertencies of the clerk which depend upon a comparison and calculation to be made by him, and which may be safely reformed by reference to other statements in writing obtained in the proceedings, and not at all to judcial errors growing out of a mistaken application of the law to the facts, notwithstanding such mistaken application by made to the clerk alone, and the court be not directly privy to it." So, in the case of *Compton* v. *Cline,* 5 Gratt. 137, an action of debt on a bond for one hundred and eighty eight dollars was described in the declaration as for one hundred and eight dollars, and the defendant confessed judgment for "the debt in the declaration mentioned," and judgment was entered for one hundred and eight dollars. This was held to be a judicial, and not a clerical error, and not amendable at a subsequent term of the court. In the case of *Morris' Adm'r* v. *Peyton's Adm'r,* 29 W. Va. 201 (11 S. E. Rep. 954) this Court held that "after the end of the term at which a consent decree is entered it can not be set aside, modified, or altered without the consent of the parties, except only to correct a clerical error," and that "a clerical error is a mistake made by the clerk in entering such consent decree, and it may be corrected by the original draft of the decree furnished the clerk by the court; or it may be a miscalculation or mistake in some arithmetical operation, whereby a sum entered in such consent decree where all the parties are agreed on the basis of the calculation, and the mistake is simply an arithmetical mistake or a simple blunder in performing an arithmetical operaton, all parties being agreed on the operation to be performed."

The defendant, however, by this notice sought to reopen the merits of the case, and again determine the proportions in which the parties were entitled to the real estate in controversy, and to reverse and correct the decrees in that respect, which we think was not permissible, and the court acted properly in refusing to interfere with or set aside said decrees upon said notice. The action of the court in re-

fusing to set aside said decrees is not assigned by the defendant as error, but, as it forms part of the record, we thought proper to make the above comment upon the action of the court.

The next step taken by the defendant, John Stewart, was to file a bill of review, in which, after reciting the proceedings had in said original cause, the destruction of the original papers by fire, and the manner in which they were supplied, he alleges that the papers supplied and filed in said cause are not the true and authenticated copies of the original papers filed in said cause, and alleges that his original answer differed very materially in its allegations from what is alleged in his answer, and points out the particulars in which said difference consists, and says that, by reason of the omission and failure to set up, claim, and charge the same in said supplied answer, he was, by the decree of the court, deprived of all of the interest in the said eighty five acres of land and personal property of which Rebecca Stewart died seised, and which was devised to him by her last will and testament. Said John Stewart also charges in said bill of review: That by reason of the failure and omission of his counsel to set up and state in said supplied answer the said allegations, claims and interest of the said Rebecca Stewart as stated in said original answer, he was wrongfully deprived of a large portion of the interests, estate and property willed and devised to him by the last will and testament of said Rebecca Stewart, and that the decrees entered in said cause upon said supplied papers therein as aforesaid, making partition and distribution of said estate, are erroneous and prejudicial to the rights, interests and claims of plaintiff, and, as he is advised and believes, ought to be reviewed, reversed and set aside; and that the decree charging him with one thousand three hundred and fifty dollars and twenty one cents as executor of the last will of Rebecca Stewart, is also erroneous, and should be reviewed, reversed and set aside. That the said will of Rebecca Stewart gives to him absolutely all of the personal estate of which said Rebecca died seised, including all of the personal property, money and effects contained in said appraisement bill, a

.copy of which is exhibited.. That on or about the 12th of November, 1892, a certain other decree was pronounced and entered in said cause, among other things decreeing and directing that said plaintiffs therein do recover from him a large sum of money, together with a large amount of costs attending the said proceedings, a copy of which decree is also exhibited; and that said last named decree ought to be reviewed, reversed and set aside for many apparent errors and imperfections appearing upon the face of said decree and upon the face of the commissioners' report filed in said cause, and from the record of all the proceedings had in said cause. That an execution under said decree had been issued against him, and placed in the hands of the sheriff of said county, directing the sheriff to collect the same out of his personal effects, goods and chattels, and he is threatening to sell the same to satisfy said execution; and, inasmuch as such errors and imperfections appear in the body of said decrees and upon the face of said commissioners' report, he prays that said decrees may be reviewed, reversed and set aside, and that the plaintiffs, and all persons acting for or under them, in levying and taking into possession his property under said decree, may be restrained and enjoined. Which injunction was awarded as prayed for.

The defendants in said bill of review appeared and demurred thereto, and also filed their answer, putting in issue all of the material allegations of said bill, and on the 26th day of June, 1893, the cause was heard upon the bill of review and exhibits therewith filed, and upon the demurrer to said bill and the answer of the defendants and exhibits and general replication of the plaintiff thereto, and upon the motion of the said defendants to dissolve the injunction awarded to the plaintiff therein, and was argued by counsel; upon consideration whereof the court sustained said demurrer, and dismissed the plaintiffs' bill of review, and also dissolved said injunction, and ascertained the amount of principal, interest, damages and costs, including officers' fees and commissions, due on the decree enjoined by said injunction heretofore awarded the plaintiff, and found the sum of forty eight dollars and nineteen cents due to each

of said parties to whom said decree is coming as principal, and the sum of one dollar and five cents to each of said parties as interest from the 19th of October, 1892, to the 30th day of March, 1893, and that the parties to whom said decree is coming are entitled to twenty dollars and thirty one cents in the aggregate as damages in lieu of interest at the rate of ten per cent. from the time the injunction took effect until the date of said decree, being one dollar and nineteen cents to each of said seventeen parties, and that there is due to said parties to whom said decree is coming the sum of three hundred and sixty dollars and seventy seven cents in the aggregate as costs on said decree, including officers' fees to date, as taxed by the clerk of the court, being the sum of twenty one dollars and twenty two cents due to each of said seventeen parties to whom said decree is coming, making in all due to said parties to whom said decree is coming of principal, interest, damages and costs, including officers' fees at this date by reason of said decree, the aggregate sum of one thousand two hundred and eighteen dollars and nineteen cents, being the sum of seventy one dollars and sixty eight cents coming to each of said seventeen parties, and directed execution to issue therefor against said John Stewart, and also directing that they recover their costs about their defense in this cause expended, and that execution issue therefor. The said John Stewart obtained this appeal.

The first assignment of error relied upon by the appellant is to the action of the court in directing a partition of the real estate in the first of said causes mentioned and described among the persons named in said decree of partition without first passing on the exceptions to the report of Commissioner John J. Brown, taken by both plaintiffs and defendant, for the reason that, if said exceptions had been passed on at that time, it would never have been proper to direct said partition in the manner that the same in said decree was and is directed. Now, it appears on the face of said decree that at the time the same was rendered the original papers, including the report of John J. Brown, and the exceptions endorsed thereon, had been consumed by fire in

the office of Dille & Son, attorneys for the plaintiffs, and that said John J. Brown had attempted to supply his former report from his best recollection, which supplied report had also been excepted to by the plaintiffs; and it further appears on the face of said decree that by consent of the plaintiffs and defendant by their respective counsel, it was agreed that the plaintiffs were entitled to sixty *per cent.* (according to quantity and value) of the land in the bill and proceedings mentioned, and that the defendant, John Stewart, was entitled to forty *per centum* (according to quantity and value) of the said lands as reported by John J. Brown, to whom said matter, among others, was referred, as commissioner, to make report thereon. This consent, entered of record, then, can be construed in no other way than as a waiver of all exceptions as to the finding of said commissioner, John J. Brown as to the proportion in which said parties plaintiff and defendant were entitled to said real estate, so that there can be nothing in the assertion made in said assignment of error that if said exceptions to Brown's report had been passed on, said partition would not have been directed in the manner the same was directed or that it would not have been proper to so direct it; and for the further reason that the same decree appointed commissioners to make said partition, whose report was confirmed without exception or objection.

The second assignment of error claims that the Circuit Court erred in making and entering the decree of reference of June 24, 1889, by therein directing that the commissioner should settle the accounts of the defendant as executor of the estate of Rebecca Stewart, deceased, while the suit was brought for the purpose of ascertaining the interest of the plaintiffs in the personal estate of Robert, John, Elizabeth, Mary, Susannah, Jane and Foster Stewart, and it is shown by all the papers in the cause that the plaintiffs had no interest or rights in the estate of said Rebecca. As to this decree, it appears that it was entered before the papers were burnt, and, after the papers were supplied, a consent decree was entered, directing the commissioner then appointed to settle the accounts of defendant as executor of the estate of

said Rebecca, and ascertain what came into his hands as
such executor, what portion of it belonged to Rebecca Stew-
art, and what belongs to plaintiffs, if any, and what was done
with the property, and the first exception endorsed on the
report of I. G. Lazzell by the defendant is because it does not
purport to settle the executorial account of said defendant
as required by the order of reference, clause ten, as there
can not be any recovery here against him, or distribution
decreed, until that is done. It is true, the commissioner
did not settle said John Stewart's account as such executor,
and he is now claiming that it was error in the court to have
directed such settlement. The proper answer to this as-
signment of error is that the defendant is not prejudiced by
the failure of the commissioner to settle his said account,
and he can not be heard to complain of it here.

The next assignment of error is to the action of the court
in allowing the papers to be supplied in the manner they
were, instead of requiring a new suit to be brought, as was
manifestly at the time unjust to the said petitioner; and be-
cause the supplying of the same in the manner they were
attempted to be supplied was prejudicial to the rights of
said petitioner, because the affidavit upon which the said
papers were supplied was insufficient under the statute.
Now, it is apparent that this assignment of error should not
avail the defendant, for the reason that if the defendant had
wished it, and had so moved, the court might have required
new pleadings to be made up under the provisions of section
fourteen of chapter one hundred and thirty which says,
among other things, that "the court may, at the instance of
either party, or in its discretion, require new pleadings to
be made up in whole or in part;" but the defendant in this
case, so far as appears, made no suggestion in regard to
new pleadings, but appeared promptly at rules, and filed his
answer, thereby submitting himself to the jurisdiction of
the court, and waiving the alleged irregularities in supply-
ing the papers, if any such existed. See *Rittenhouse* v. *Har-
man*, 7 W. Va. 380, where it is held that, "though a bill be
multifarious, and but vaguely state the matter on which re-
lief is sought, consent by the parties to an interlocutory de-

cree that the cause be referred to a commissioner to audit, state and settle an account of the amount due each of the plaintiffs is a waiver of any objection to such irregularity, and a demurrer thereafter for such cause is properly disallowed."

The next assignment of error is that the court erred in the decree of partition as to the Smith land in the manner it was partitioned by said court, for the reason that the said Rebecca Stewart had far more interest in the same, as she had also in the home farm—and which said interest also passed to defendant—than had all of the plaintiffs combined, and than is allowed and ascertained by the court in the said final decree in said first named chancery cause. This assignment of error is also met and overthrown by the consent decree, which ascertained the proportions in which the parties were entitled to said land; and the defendant, having consented on the record to said decree, can not now be heard to object or complain after the matter has been referred to a commissioner under a consent decree, and the commissioner's report confirmed without exception.

The next assignment of error is that the "court erred in its final decree in the distribution of the personalty left by Rebecca Stewart, because the heirs of John Stewart would have no interest in any accumulations of personalty of the life-tenant from said real estate (not acquired more than two years after the death of John Stewart) nor would the plaintiffs have any interest as heirs in the personal estate of Rebecca Stewart, or any accumulations therein." This depends to some extent upon the facts which were submitted to the commissioner for ascertainment in pursuance of the agreement of record, and the facts having been ascertained by the commissioner, and reported to the court, and the report having been confirmed by the court. The question is determined by the case of *Handy v. Scott*, 26 W. Va. 710, in which this Court held that: "When questions purely of fact are referred to a commissioner to be reported upon, the findings of the commissioner, while not as conclusive as the verdict of a jury, will be given great weight, and should be sustained unless it plainly appears that they are not war-

ranted by the evidence. This rule operates with peculiar force in an appellate court where the findings of the commissioner have been approved and sustained by the decree of the inferior court." See, also, *Moore* v. *Ligon*, 30 W. Va. 146 (3 S. E. Rep. 572); and *Reger* v. *O'Neal*, 33 W. Va. 159 (10 S. E. Rep. 375). And as to the distribution of the personal estate the Code provides, s. 9, c. 78, that when any person shall die intestate as to his personal estate, or any part thereof, the surplus, after the payment of funeral expenses, charges of administration and debts, shall pass and be distributed to and among the same persons, and in the same proportions, to whom and in which the real estate is directed to descend, *etc.* Now, in this case, the plaintiffs and the defendant, with all the facts before them, have seen proper by consent and agreement to fix the proportions in which the real estate in controversy should be divided, giving to the plaintiffs sixty *per cent.* and to the defendant forty *per cent.* thereof, and no good reason is assigned why the personalty should not be shared in the same proportion, although the court in this instance seems to have decreed the defendant fifty *per cent.* instead of forty *per cent.;* and, if this is an error, it is one of which the defendant can not complain.

The weight of evidence clearly indicates that the children of Robert Stewart who became the purchasers of the home place from those that married and moved away lived on the farm as a family, and what was realized from their labor became a common fund, and this view of the case is sustained by the fact that John Stewart, Sr., in his last will and testament, gave his property to his brother Foster and five sisters, who were living on the farm, in equal proportions, and directed that in case of the death of either of them the others were to have his or her share, and to continue in the same way until the death of the last heir, then to be divided among his legal heirs; showing the intention to keep the property in the hands of those residing on the farm as long as they or any of them lived. And when Rebecca came to dispose of her property by will she could dispose of no more than she was entitled to. If the personal property in her

possession was the result of the joint labor and industry of herself and those who had lived and died on the farm, she would be entitled to no more than she inherited, and could dispose of no more than she was entitled to; so that the determination of the question as to the proper disposition or distribution of the personal property depends at last upon the facts °proven, and the proper conclusion to be reached therefrom. This entire matter has been referred to a commissioner, who has reported, and whose report has been confirmed by the court. It is true, the report of the commissioner was excepted to, but the exceptions were overruled by the court, as we think, properly. The rule in regard to exceptions to commissioners' reports is laid down in the case of *Chapman* v. *Railroad Co.*, 18 W. Va. 185, section 9 of syllabus, as follows: "Generally, exceptions to the reports of master commissioners partake of the nature of special demurrers, and, if the report is erroneous, the party complaining of the report or excepting thereto must point out the errors in his exceptions with reasonable certainty, so as to direct the mind of the court to them. When he does so, the parts not excepted to are admitted to be correct, not only as regards the principles, but also as relates to the evidence on which they are founded." See, also, *McCarthy* v. *Chalfant*, 14 W. Va. 531. The exceptions to this report are too general, and partake more of the nature of an argument upon the facts alleged to have been proven than they do to that of a special demurrer, and were properly overruled.

The queston raised as to setting aside the final decree upon notice and motion has already been adverted to, and, in addition, it is only thought necessary to say that this was not a decree by default; nor, if any error existed, was it such an error as could be corrected under section one of chapter one hundred and thirty four of the Code, and the court committed no error in refusing to set aside said decree upon said notice and motion.

We come now to consider the last error assigned by the appellant, to wit, that the court erred in sustaining the demurrer to the appellant's bill of review, and dissolving the injunction granted in aid of the same. In discussing the

questions arising in the orignal cause we have passed upon all of the questions raised by the bill of review, even if the court would entertain a bill of review under the circumstances of this case. Did the court err in sustaining the demurrer to said bill of review? We have seen that the land in controversy was partitioned under a consent decree, and the report of the commissioners appointed to make such partition was confirmed without exception; that by the same consent decree the cause was referred to a commissioner to report certain matters necessary to a proper distribution of the personalty, who reported, and, although the report was excepted to, the exceptions, as we think, were properly overruled. Upon the question, then, as to whether said demurrer was properly sustained, we find the law stated in Sands' Suit in Equity, page 695, § 631, as follows: "The causes for which a bill of review may be maintained are limited to these: (1.) There must be error in law apparent upon the face of the decree;" citing 2 Rob. Prac. (Old) 414, *etc.* "(2) The party seeking to review the decree must allege and prove the discovery of new matter, which could not have been used at the time of making the decree in consequence of the parties' ignorance that such matters existed." See *Amiss* v. *McGinnis*, 12 W. Va. 371. The errors suggested by this bill of review, however, are claimed to be errors of fact, and not errors of law, and there is no claim as to after discovered evidence. But again we find the law with reference to bills of this character stated in Daniell's Chancery Practice, volume 2 (6th Ed.) on page 974, as follows: "A decree or order made by consent can not be set aside, either by rehearing or appeal or by bill of review, unless by clerical error anything has been inserted in the order as by consent, to which the party has not consented, in which case a bill of review might lie." See, also, *Thompson* v. *Railroad Co.*, 95 U. S. 391, where it is held that "none but parties and privies can have a bill of review, and it will not lie where the decree in question was passed by consent." See, also, 2 Daniell, Ch. Pr. p. 157. And, while the final decree in the original cause was not a consent decree, the decree which settled the principles of the cause was a con-

sent decree, and the final decree followed as a consequence.

For these reasons my conclusion is that the court committed no error in sustaining the demurrer to said bill of review, and the decree complained of must be affirmed, with costs and damages.